FILED
3/9/2026
Court of Appeals
Division I
State of Washington

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

In the Matter of the Detention of:

M.B.,

            Appellant.

No. 88002-1-I

DIVISION ONE

UNPUBLISHED OPINION

COBURN, J. — M.B. assaulted hospital staff and another patient while hospitalized at Fairfax Behavioral Health. Fairfax petitioned to commit M.B. for 14 days of involuntary treatment for a mental disorder. The trial court found that because of a mental disorder, M.B. posed a likelihood of serious harm to others and granted Fairfax's petition. M.B. challenges the trial court's order, arguing that the record lacks sufficient evidence to support the trial court's findings. We disagree and affirm.

FACTS

M.B. is a 33-year-old male diagnosed with schizoaffective disorder. Starting around August or September 2024, M.B.'s mental health provider Elizabeth Quackenbush, program manager for the Navos Mental Health PACT[1] team, observed

---

[1] PACT is short for the Program for Assertive Community Treatment. The PACT team provides multi-disciplinary wraparound mental health and stabilization services to clients living in the community who have a history of hospitalizations or incarcerations.

M.B. as showing signs of decompensation and that he was refusing to take his medication.

In December 2024 M.B. met with Quackenbush in her office after he made some delusional requests to her. M.B. initially refused to leave when Quackenbush let him know it was time to go. When Quackenbush moved to hand M.B's bag to him, M.B. became agitated, stood up and approached Quackenbush, got into her personal space, and told her not to touch his things. As M.B. went to leave, he threatened to come back and kill the PACT team. The interaction and M.B.'s statements caused Quackenbush to worry that M.B. might harm her or her staff.

On January 22, 2025, Quackenbush referred M.B. for an evaluation by a county designated responder (DCR) based on concerns that he was not caring for himself, was expressing delusional beliefs about a fictional wedding, and had been hostile and physically aggressive toward staff at the PACT team's office. After evaluating M.B., a DCR petitioned for M.B.'s initial detention under the involuntary treatment act (ITA).[2] The trial court granted the petition on the grounds that M.B. presented a likelihood of serious harm to others and was gravely disabled.

Following M.B.'s initial detention, Fairfax petitioned for 14 days of involuntary treatment under the ITA. Fairfax asserted that M.B. was suffering from a mental disorder, presented a likelihood of serious harm to himself and others, and that he was gravely disabled.

Quackenbush, Northwest Hospital court evaluator Joseph Cisneros, and Fairfax lead court evaluator Brian Hayden testified at the 14-day involuntary treatment hearing.

---

[2] Ch. 71.05 RCW.

Both Cisneros and Hayden read from medical records that M.B. stipulated were admissible under the business records exception to the rule against hearsay.[3] M.B. also testified on his own behalf.

Quackenbush testified that she had worked with M.B. for about a year and a half and that she had observed him decompensating over the last five or six months and that he was refusing to take any medication. Quackenbush testified to M.B.'s history of hospitalizations and that at least some of the prior hospitalizations occurred under similar circumstances, including M.B.'s refusal to take medication.

Cisneros read aloud a portion of medical records, including chart notes, from M.B.'s initial treatment at Northwest Hospital upon his detention. The records indicated that M.B. was transported to the emergency department at Northwest Hospital on January 28, where he arrived wearing a spit hood after spitting at staff. While in the emergency department, M.B. demonstrated more agitation and verbally abusive behavior toward staff. The following day M.B. spoke aggressively to staff at Northwest Hospital before being transferred to Fairfax for continued treatment.

Hayden testified that M.B. was suffering from a mental impairment due to a "working diagnosis [of] schizoaffective disorder, bipolar type, with a rule out of schizophrenia." Hayden testified that M.B.'s mental impairment was impacting his cognitive and volitional functioning as demonstrated by impaired impulse control, assaultive behavior toward staff and peers, verbal and physical aggression, psychomotor agitation, irritability, and inappropriate sexual behavior. Additionally, M.B. was "endorsing multiple delusions" that were preventing him from being able to work on

---

[3] See ER 801(c), 802; RCW 5.45.020.

a discharge plan.

Hayden based his evaluation in part on a review of M.B.'s medical chart at Fairfax as well as his observations of M.B. Hayden read into the record from chart notes relevant to his evaluation. A note by a psychiatrist who evaluated M.B. upon his arrival to Fairfax on January 29 indicated that M.B. refused to participate in his psychiatric evaluation and threatened to kill the psychiatrist. M.B. demonstrated delusional thoughts, paranoid behavior, as well as hostile, aggressive, and threatening behavior. M.B.'s affect was "inappropriate" and "labile." The psychiatrist also documented M.B. as presenting with passive homicidal ideation with self-reported means, poor insight based on his denial of illness and need for treatment, and poor judgment based on his ability to draw appropriate conclusions and his responses to social situations. Another chart note from that same day stated that M.B. was agitated because he could not go to the gym. M.B. threw hot oatmeal on a Fairfax staff member's face, pushed the staff member to the ground, and kicked them in the face. M.B. was put on a physical hold and given medications in the form of a chemical restraint due to his imminent danger to others.

Another note stated that M.B. cussed at and threatened to kill staff at Fairfax. A progress note from February 1 described M.B. as punching another patient while in the hallway "with no clear apparent reason," requiring staff to intervene. In a separate incident on the same day, M.B. was noted as being anxious, pacing, and responding to internal stimulus by talking to himself before threatening and punching another patient in the face. Fairfax staff repeatedly documented M.B. as pacing while talking to himself or responding to internal stimuli.

On February 9 M.B. called the front desk at Fairfax and made threatening

comments about another patient. M.B. was on assault precautions at this time. During a February 15 psychiatric evaluation, M.B. presented with delusions, poor and illogical thought processing, an unstable mood, a labile affect, and restless, fidgety, and hyperactive psychomotor behavior. His speech was pressured, hyperverbal, and loud. On February 17 M.B. was noted as expressing delusional thoughts. On this day M.B. was again documented as pacing and responding to internal stimuli and as talking loudly on the phone, laughing loudly, and screaming.

The next day, on February 18, M.B. was documented by a nurse as having auditory hallucinations. M.B. denied having them, demonstrating poor insight. This same day M.B. denied having his first and last name and denied that his apartment was burned despite a case manager showing him pictures of the unit that was damaged by someone else. M.B. was observed by the case manager as telling nurses that he could hear "wives" having sex with other men and needed to get out of the hospital.

Also on February 18, M.B. was assessed by a psychiatrist as demonstrating worse anxiety, a hostile attitude as well as pressured, hyperverbal, and loud speech. His psychomotor behavior was documented as restless, fidgety, and hyperactive. Additionally, his thought process was "noted for poor processing, illogical, circumstantial, and tangential," with "[t]hought content noted for paranoia, delusions, and grandiosity" and impaired insight and judgment.

Hayden testified that M.B. remained a risk of harm to others. Hayden described M.B. as "showing very poor impulse control," making threatening statements, being unable to engage with reality, "highly delusional," and demonstrating a lack of insight regarding his problematic behavior. Hayden believed that due to M.B.'s continued lack

of impulse control, M.B. would become assaultive and attempt to do the things he threatens if he were in the community that "would put a reasonable person in adequate fear."

The trial court found that as the result of a mental disorder, M.B. presented a likelihood of serious harm to others. The trial court found in its written findings:

The Court finds the testimony of [Fairfax's] witnesses to be credible.

…

The Court finds that [M.B.] suffers from a behavioral health disorder with a working diagnosis of schizoaffective disorder. The Court finds that this disorder has a substantial and adverse effect on [M.B.'s] cognitive and volitional functioning as evidenced by his delusional thoughts, responses to internal stimuli, assaultive and agitated behaviors towards staff and peers, and inability to realistically plan for discharge or his own safety.

The Court finds that [M.B.] poses a risk of physical harm to others. The Court finds that [M.B.] was acting aggressive and agitated with his outpatient team prior to admission, including making threats to come back and kill them. The Court also finds that he has assaulted staff or peers multiple times in the hospital, including throwing hot oatmeal on someone's face and then kicking them, punching a peer, and making threats to kill his provider. The Court finds that [M.B.] has made threats while having a history of prior violent acts, caused harm to others, and caused others to fear for their safety due to his behavior.

The Court does not find that [M.B.] is gravely disabled and dismisses that allegation.[4]

…

The Court finds that a less restrictive alternative is not currently appropriate because [M.B.] remains symptomatic at the hospital, is denying the need for any treatment, and does not demonstrate insight into his diagnosis.

The court also found as part of its oral ruling that M.B.:

continue[s] to be a likelihood of serious harm to others as a result of his

---

[4] The trial court's dismissal of Fairfax's allegation that M.B. was gravely disabled is not at issue in the instant appeal.

assaultive behavior in the hospital, especially given that he's been assaultive of hospital staff which, as far as nurses, doctors, hospital staff constitute first responders which could be a charge of up to an Assault 2, Assault 3, if the hospital decided to have [M.B.] arrested.[5]

The trial court involuntarily committed M.B. for a period not to exceed 14 days.

M.B. appeals.

DISCUSSION

Likelihood of Serious Harm

M.B. contends that the trial court erred when it entered the 14-day involuntary commitment order because there was insufficient evidence that M.B. presented a likelihood of serious harm to others. Because a fair-minded person could conclude that Fairfax showed by a preponderance of evidence that M.B. as a result of his mental disorder caused physical harm or placed persons in reasonable fear of sustaining such harm, we disagree.

When presented with a challenge to the sufficiency of the evidence underlying the trial court's involuntary commitment order, our review "is limited to determining whether substantial evidence supports the findings and, if so, whether the findings in turn support the trial court's conclusions of law and judgment." In re Det. of LaBelle, 107 Wn.2d 196, 209, 728 P.2d 138 (1986). "Substantial evidence is 'evidence that is in sufficient quantum to persuade a fair-minded person of the truth of the declared premise.'" In re Det. of T.C., 11 Wn. App. 2d 51, 56, 450 P.3d 1230 (2019) (internal quotation marks omitted) (quoting In re Det. of A.S., 91 Wn. App. 146, 162, 955 P.2d 836 (1998)). The burden is on the challenging party to show that substantial evidence does not support the trial court's findings of fact. Id. We do not disturb the trial court's

---

[5] The trial court adopted and incorporated its oral findings into its written findings of fact and conclusions of law.

assessment of witness credibility or reweigh the evidence. In re Det. of A.F., 20 Wn. App. 2d 115, 125, 498 P.3d 1006 (2021). "Unchallenged findings of fact are verities on appeal." In re Det. of L.S., 23 Wn. App. 2d 672, 686, 517 P.3d 490 (2022).

Under the ITA, the trial court may involuntarily commit an individual for up to 14 days if the petitioner proves by a preponderance of the evidence at the probable cause hearing that the person, "as the result of a behavioral health disorder, presents a likelihood of serious harm, or is gravely disabled." RCW 71.05.240(4)(a). The trial court must consider less restrictive alternatives, but if it finds that none are sufficient, the ITA requires the trial court to order that the individual be detained to a licensed treatment facility. Id. Because involuntary commitment is a "massive curtailment of liberty," courts must strictly construe the statutes regulating these proceedings. Humphrey v. Cady, 405 U.S. 504, 509, 92 S. Ct. 1048, 31 L. Ed. 2d 394 (1972); In re Det. of D.W., 181 Wn.2d 201, 207, 332 P.3d 423 (2014).

RCW 71.05.020(37)(a)(ii) defines "[l]ikelihood of serious harm" to others as a substantial risk that "physical harm will be inflicted by a person upon another, as evidenced by behavior which has caused such harm or which places another person or persons in reasonable fear of sustaining such harm." A substantial risk of harm need not be "imminent" because "the practical effect of being placed in the hospital will usually eliminate the 'imminence' of one's dangerousness." In re Det. of Harris, 98 Wn.2d 276, 283-84, 654 P.2d 109 (1982). A showing of substantial risk of physical harm instead requires evidence of "'a recent overt act,'" which may be an act that "'caused harm or creates a reasonable apprehension of dangerousness.'" T.C., 11 Wn. App. 2d at 57 (quoting Harris, 98 Wn.2d at 284-85). This court has previously interpreted "reasonable

fear of sustaining such harm" under RCW 71.05.020 as requiring "that the person threatened be in fear, that they must be in fear of harm to themselves, and that the harm they are fearful of must be in the nature of the harm threatened." In re Det. of D.V., 200 Wn. App. 904, 907, 403 P.3d 941 (2017).

RCW 71.05.245(3) provides that in determining whether there is a likelihood of serious harm, the trial court must give great weight to the person's recent history of one or more violent acts or recent history of one or more commitments based on a likelihood of serious harm, though such history "shall not be the sole basis for determining whether a person presents a likelihood of serious harm." The provision defines "recent" as the period of time that is three years or less before the probable cause hearing. RCW 71.05.245(3).

Here, the record presents sufficient evidence to support the trial court's finding that M.B. posed a likelihood of serious harm to others under RCW 71.05.020(37).

Fairfax presented evidence of multiple recent overt acts evidencing a substantial risk of harm due to M.B.'s schizoaffective disorder, including evidence that M.B. spat at hospital staff requiring him to wear a spit hood during his transport to Fairfax and that he threatened and punched another patient in the face unprovoked during his hospitalization. Additionally, M.B. threw hot oatmeal at a Fairfax staff member's face, pushed the staff member to the ground, and kicked them in the face. This latter incident required M.B. to be put on a physical hold and administered chemical restraints due to the imminent risk that he posed to others.

M.B. was also repeatedly documented as making threats to kill hospital staff while at Fairfax. The record further supports that prior to his hospitalization at Fairfax,

M.B. was acting agitated and aggressive toward his community mental health provider Quackenbush and threatened to come back to her office to kill her and her PACT team colleagues, causing Quackenbush to worry.

We reject M.B.'s argument that because no evidence was presented as to whether M.B. caused physical injury to anyone, there is insufficient evidence to support the trial court's finding that M.B. posed a likelihood of serious harm. RCW 71.05.020 does not require proof of physical injury. See RCW 71.05.020(37)(a)(ii). The statute requires a showing of a recent overt act that caused harm or creates a reasonable apprehension of harm. T.C., 11 Wn. App. 2d at 57; D.V., 200 Wn. App. at 907. Here, the record provides substantial evidence of multiple recent overt acts by M.B. that caused harm to a patient and hospital staff and that created a reasonable apprehension of harm to providers in the community and in the hospital.

M.B. also argues that Fairfax failed to meet its burden to prove by a preponderance of evidence the likelihood of serious harm because "[t]he last noted physical assault by M.B. occurred on February 1," 19 days prior to the trial court's entry of the involuntary commitment order. M.B. asks this court to consider evidence that M.B. was repeatedly documented by Fairfax staff as cooperative, compliant, and a low risk of violence after February 1. We do not review a trial court's decision regarding the persuasiveness of evidence. A.F., 20 Wn. App. 2d at 125. As stated above, a substantial risk of harm under RCW 71.05.020 need not be imminent. Harris, 98 Wn.2d at 283-84. And here, all the above-referenced incidents that support the trial court's finding that M.B. posed a substantial risk of harm occurred within the statutory three-year time frame under RCW 71.05.245(3).

Moreover, the record supports that M.B.'s assaultive behavior, impaired impulse control, irritability, and psychomotor agitation was indicative of the impact of M.B.'s schizoaffective disorder on his cognitive and volitional functioning that presented a likelihood of serious harm. A few days prior to the probable cause hearing, M.B. was evaluated by a Fairfax psychiatrist as experiencing hallucinations, paranoia, and delusions, and demonstrating worse anxiety, impaired judgment, hostility, and psychomotor restlessness. Hayden further testified that M.B. remained a risk of harm to others due to his delusional thinking, lack of impulse control and insight, and threatening statements. Specifically, Hayden testified that due to M.B.'s continued lack of impulse control, M.B. would become assaultive and act upon his threats in the community that "would put a reasonable person in adequate fear."

The evidence in the record supports that M.B.'s behavior due to a mental disorder recently caused physical harm and/or created a reasonable apprehension of dangerousness. We conclude that substantial evidence supports the trial court's findings and conclusion that M.B. presented a likelihood of serious harm to others.

Affirmed.[6]

_Coburn, J._

WE CONCUR:

_Chung, J._

_Hazelrigg, J.(?)_

---

[6] Involuntary civil commitment cases are not moot on appeal even after the commitment period has ended because such commitments may constitute evidence in later proceedings. See In re Det. of M.K., 168 Wn. App. 621, 629, 279 P.3d 897 (2012); RCW 71.05.245(3). Fairfax does not argue otherwise.